UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
MGG INVESTMENT GROUP LP,                      :
                            Plaintiff,         :
                                               :
                - against -                    :
                                               :    Civil Action No.   20-8886
LEONARD C. GREEN & CO., PA d/b/a THE :
GREEN GROUP,                                   :
                                               :
                            Defendant.         :
-------------------------------------------------------- x

## COMPLAINT

Plaintiff MGG Investment Group LP ("MGG"), by and through its undersigned

counsel, for its complaint against Defendant Leonard C. Green & Co., PA d/b/a The Green

Group ("Defendant" or "TGG"), alleges as follows:

## NATURE OF THE ACTION

1.      This is an action to recover damages arising from a fraudulent scheme perpetrated

by TGG, together with Zayat Stables, LLC ("Zayat Stables") and members of the Zayat family,

*inter alia*, to conceal the improper sale of collateral securing a series of loans made to Zayat

Stables by MGG.

2.      Specifically, Zayat Stables sold many horses and other equine assets that were

collateral under the loans and failed to report any of those sales to MGG or to make payment of

the proceeds of those sales to MGG, all as required by the applicable loan documents in the event

of a sale of equine collateral.

3.      Through documents produced in related actions involving Zayat Stables and the

Zayat family, MGG learned that TGG prepared false and misleading financial statements that

enabled Zayat Stables to hide these sales of equine collateral and to circumvent the requirements

of the applicable loan documents.

4.      As a result of the concealment of sales revenue, manipulation of accounts payable, and the concealment of other defaults under the loan documents by Zayat Stables, members of the Zayat Family and TGG, as detailed in greater detail below, MGG was unaware of the defaults by Zayat Stables under the loan agreements and did not accelerate the loan when it could have, before Zayat Stables had sold much of the equine collateral securing the loan.  By the time Zayat Stables failed to satisfy its payment obligations on September 30, 2019, MGG could not realize on the collateral that secured the loans because much of it had already been sold and those sales were hidden from MGG by Zayat Stables and members of the Zayat family, all with the active participation of TGG.  To date, more than $24 million in principal, plus accrued interest, remains unpaid, with little collateral against which MGG can recover.  This state of affairs would not have been possible without TGG's wrongful acts.

5.      TGG had full knowledge that the annual and quarterly financial statements and opinions and monthly financial reports it was preparing were being provided to, and relied upon by, MGG.  TGG also knew that Zayat Stables' sales of equine collateral were not reported to MGG, as they were required to be.  Yet TGG nevertheless prepared audited financial statements and financial reports that excluded those sales from Zayat Stables' revenue.  That deliberate misrepresentation hid millions of dollars of revenue from MGG—in 2017 alone, Zayat Stables' revenue from equine sales was understated by *nearly $4.5 million*.

6.      In addition to defrauding MGG, TGG also committed professional malpractice by repeatedly failing to ensure that Zayat Stables' financial statements were prepared, as required, in accordance with Generally Accepted Accounting Principles ("GAAP").  Both the failure to record revenue and the manipulation of accounts payable were violations of GAAP.  But TGG committed numerous other violations as well.

7.     First, when TGG did record revenue from equine sales, it did so on a cash basis, not an accrual basis as is required by GAAP.  This had the effect of artificially delaying the recognition of revenue from those sales.

8.     Second, as set forth in greater detail below, TGG violated the principles of Objectivity and Independence, Due Care, and Integrity as set forth by the American Society of American Institute of Certified Public Accountants ("AICPA"), by, *inter alia*:

a.     modifying and manipulating financial statements in response to directions from Zayat Stables;

b.     discussing loans and investment opportunities between TGG and its client, Zayat Stables, and Zayat Stables' principals;

c.     attempting to profit from Zayat Stables' financial difficulty by trying to buy breeding rights to Triple Crown winner AMERICAN PHAROAH at a discount;

d.     sending a current employee to work as a bookkeeper in Zayat Stables' offices; and

e.     fabricating expenses at Zayat Stables to account for personal credit card charges incurred by members of the Zayat Family.

9.     Because of these actions, TGG bears responsibility for MGG's loss.

## **PARTIES**

10.     Plaintiff MGG is a Delaware limited partnership located at One Pennsylvania Plaza, New York, New York 10119.  Pursuant to the Financing Agreement with Zayat Stables, described below, MGG is the Administrative Agent and Collateral Agent and was appointed and authorized by the lenders party thereto to enforce the rights and remedies of the lenders under the Financing Agreement, the Pledge and Security Agreement referenced below and the other loan documents referenced in the Financing Agreement (collectively, the "Loan Documents"). (Financing Agreement § 10.01.)

11.     Upon information and belief, Defendant Leonard C. Green & Co., PA d/b/a The Green Group is a Professional Association organized under the laws of New Jersey, with its principal place of business located at 900 Route 9, Woodbridge, New Jersey 07095.  TGG advertises on its website that it is "an accounting, tax, consulting and advisory firm with a unique approach—out of the box, entrepreneurial thinking. With a team of seasoned, highly successful entrepreneurs, family business owners, real estate owners, investors and specialists in IRS audits and thoroughbred racing, we see the business world through a special lens and find solutions in ways our competition simply cannot."

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of costs, and the action is between citizens of different states.

13.     This Court has personal jurisdiction over TGG pursuant to N.Y. Civil Practice Law & Rules § 302(a) because TGG (i) transacted business in New York in connection with the actions at issue here and/or (ii) committed a fraud that caused injury to MGG in New York and TGG regularly does or solicits business, or engages in any other persistent course of conduct, within New York.  TGG has sufficient minimum contacts with this district to render this Court's exercise of jurisdiction permissible under traditional notions of due process.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in this district.  TGG conducts substantial business in this district, and many of the acts and much of the conduct that constitutes the violations of law complained of herein, including the dissemination to MGG of false and misleading financial information, occurred in this district.

4

## RELEVANT FACTS

**Background**

15.     Zayat Stables is a thoroughbred horseracing company.  In 2015, Zayat Stables'
horse, AMERICAN PHAROAH, became horseracing's 12th Triple Crown winner as well as the
Breeders' Cup Classic champion.

16.     At all relevant times, TGG was engaged as Zayat Stables' auditor and accountant.
Under that engagement, TGG was responsible for determining whether Zayat Stables' "financial
statements are fairly presented, in all material respects, in conformity with U.S. generally
accepted accounting principles."[1]  TGG also agreed to "assist in preparing [Zayat Stables']
financials statements in conformity with U.S. generally accepted accounting principles."

17.     MGG is in the business of providing financing solutions to mid-size and growing
companies.

18.     On or about July 26, 2016, Zayat Stables as the Borrower entered into a financing
agreement with certain affiliates of MGG, and MGG as Administrative Agent and Collateral
Agent (the "Financing Agreement").  A true and correct copy of the Financing Agreement is
attached hereto as Exhibit B.[2]

19.     The Financing Agreement provided for a term loan in the aggregate principal
amount of $25 million and a delayed draw term loan of up to $10 million.

---

[1]  A true and correct copy of the engagement letter between TGG and Zayat Stables for 2017 is attached hereto as
Exhibit A.  The engagement letters for all other periods relevant to this action are substantively identical to the 2017
letter.

[2]  Capitalized terms not otherwise defined have the meanings given to them in the Financing Agreement.

20.     On September 30, 2016, Zayat Stables and MGG executed the first amendment to the Financing Agreement whereby MGG provided Zayat Stables with $5 million of the delayed draw term loan, resulting in loans to Zayat Stables totaling $30 million (the "Loans").

21.     The Loans were secured by all of Zayat Stables' assets, including all of its horses and the AP Breeding Rights, which were nine lifetime breeding rights for AMERICAN PHAROAH that had been transferred by the wife and children of the principal of Zayat Stables, Ahmed Zayat, to Zayat Stables as collateral for the Loans.  Each of the nine AP Breeding Rights entitles its holder to breed one thoroughbred mare with AMERICAN PHAROAH in each breeding season over the course of the horse's life and was extremely valuable given the success of AMERICAN PHAROAH.

22.     Under the Financing Agreement, Zayat Stables affirmatively agreed to provide MGG with comprehensive and accurate financial reporting, including the following:

a.      Monthly "flash reporting of key financial and operating metrics of the Borrower and its Subsidiaries" (Financing Agreement § 7.01(a)(i));

b.      "[Q]uarterly financial statements, including a balance sheet, income statement and cash flow statement of the Borrower and its Subsidiaries as at the end of such quarter . . . certified by an Authorized Officer of the Borrower as fairly presenting, in all material respects, the financial position of the Borrower and its Subsidiaries as of the end of such quarter and the results of operations and cash flows of the Borrower and its Subsidiaries for such quarter and for such year-to-date period, in accordance with GAAP applied in a manner consistent with that of the most recent audited financial statements of the Borrower and its Subsidiaries"  (Financing Agreement § 7.01(a)(ii)); and

c.      Annual "consolidated and consolidating balance sheets, statements of operations and retained earnings and statements of cash flows of the Borrower and its Subsidiaries . . . and accompanied by a report and an opinion, prepared in accordance with generally accepted auditing standards, of independent certified public accountants of recognized standing selected by the Borrower and satisfactory to the Agents . . . together with a written statement of such accountant to the effect that, in making the examination necessary for their certification of such financial statements, they have not obtained any knowledge of the existence of an

> Event of Default or a Default under Section 7.03 and (y) if such
> accountants shall have obtained any knowledge of the existence of an
> Event of Default or such Default, describing the nature thereof (Financing
> Agreement § 7.01(a)(iii)).

23.     Zayat Stables also agreed to "[k]eep, and cause each of its Subsidiaries to keep, adequate records and books of account, with complete entries made to permit the preparation of financial statements in accordance with GAAP."  (Financing Agreement § 7.01(e)).

24.     Under TGG's engagement with Zayat Stables, TGG was responsible for preparing the aforesaid financial statements and reports required under the Financing Agreement in conformity with GAAP.

**TGG and Zayat Stables Perpetrate a Fraud on MGG By Concealing Revenue From Equine Sales**

25.     Based on documents and information provided to MGG in other related actions, and upon information and belief, beginning no later than May 2017 and continuing through at least as recently as January 2020, Zayat Stables and its principal, Ahmed Zayat as well as Justin Zayat, President of Zayat Stables, and other members of the Zayat Family, with the active participation of Defendant TGG, engaged in a fraudulent scheme whereby they sold off millions of dollars of the equine collateral that secured the loans from MGG without obtaining MGG's consent, or making required payments to MGG, while concealing the sales from MGG.  As a result of the improper sale of the equine collateral, MGG is unable to recover the outstanding loan balance owed by Zayat Stables.

26.     Under the Financing Agreement, in the event of a disposition (other than the involuntary loss, damage or destruction of property or any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property), including the disposition of horses and other equine collateral, Zayat Stables was obligated to use a certain percentage of the proceeds of the disposition (not less than 40%

and in some cases up to 100%, depending on the disposition at issue) to partially pre-pay the outstanding principal of the loans.  (Financing Agreement § 2.05(c)(ii).)

27.      Each of Zayat Stables' sales were hidden from MGG such that MGG never consented to any of the sales.  Further, Zayat Stables made the sales in question for prices far below the appraised value of the Equine Collateral, and TGG concealed those proceeds, and the fact of the sales, from MGG in order to allow Zayat Stables to continue its fraudulent scheme undetected.

28.      Any failure to pre-pay as required by Section 2.05(c)(ii) constituted an Event of Default under the Financing Agreement.  (Financing Agreement § 9.01(a).)  Upon an Event of Default, MGG may "declare all or any portion of the Loans then outstanding to be accelerated and due and payable."  (*Id.* § 9.01.)

29.      By ensuring that none of Zayat Stables' improper sales were ever reported to MGG, as was explicitly required under the Financing Agreement, TGG played a central role in the fraudulent scheme.

30.      In mid-2017 Zayat Stables began selling off horses worth millions of dollars. Zayat Stables concealed these sales in order to keep the proceeds of the sales and avoid having to use the sales proceeds to pay down principal on the MGG loans, as required by the Loan Documents, and to conceal the continuing Events of Default under the Loan Documents that, if discovered by MGG, would have allowed and caused MGG to accelerate Zayat Stables' repayment obligations and/or exercise rights or remedies under the Loan Documents or applicable law, at a time when there was significant collateral which could have been used by MGG to pay off the loans.

31.     TGG's failure to include the equine sales at issue in this action rendered Zayat Stables' financial statements and reports false and misleading.

32.     The improper sales included Zayat Stables' most valuable assets, most notably the nine breeding rights to AMERICAN PHAROAH which were pledged to secure the Loans.

33.     The improper sales and, as set forth below, collections of insurance proceeds also included other valuable Equine Collateral that was pledged to MGG to secure the loans pursuant to the Loan Documents, including, but not limited to, Zayat Stables' interests in EL KABEIR, AMERICAN CLEOPATRA (and one of her foals), LEMOONA, AMANDREA, SOLOMINI, JUSTIN SQUARED, SIENA MAGIC, EMMZY, EGYPTIAN PRINCE, LADY TNT, 2016 CRSONALITY (sp.), METROPOL, SASSY SIENA's foal, NANOOSH, stallion shares in PIONEER OF THE NILE, ESKENDEREYA, ZENSATIONAL, JUSTIN PHILLIP, GRAMMAJO, DANYELLI, LEZENDARY, OLD GLORY, ASH N' EM, MAJID, and stallion shares in BODEMEISTER.

34.     Specifically, in 2017, Zayat Stables and TGG concealed from MGG, at a minimum, the following improper equine sales:

          a.     JUSTIN SQUARED for $275,000, on or around May 15, 2017;

          b.     SIENA MAGIC for $512,000, on June 23, 2017; and

          c.     EL KABEIR for $500,000, on or around September 20, 2017;

          d.     stallion shares in PIONEER OF THE NILE and BODEMEISTER for over
                 $1.5 million, in September 2017; and

          e.     AMERICAN CLEOPATRA for $1.3 million, on or around November 15,
                 2017.

35.     In addition to these sales, upon information and belief Zayat Stables and TGG also concealed insurance claims of $407,000 for EMMZY and $500,000 for EGYPTIAN PRINCE in 2017.

36.    In 2018, Zayat Stables and TGG also concealed from MGG, at a minimum, the following improper equine sales:

       a.    LADY TNT for $335,000, in or around March 2018;

       b.    2016 CRSONALITY for $250,000;

       c.    METROPOL for $200,000, in or around April 2018;

       d.    SASSY SIENA's foal, for $86,000 without MGG's knowledge that SASSY SIENA had been bred;

       e.    NANOOSH, sold a larger percentage of the horse for a lower valuation than reported to MGG.

37.    From December 2018 through June 2019, Zayat Stables also purported to sell all nine of the AP Breeding Rights, with proceeds totaling $3.3 million.  An appraisal conducted in June 2017 concluded that the nine AP Breeding Rights had a fair market value of $10.8 million.

38.    Despite its obligation to do so under the Loan Documents, Zayat Stables did not inform MGG of any of the purported sales of the AP Breeding Rights and did not use the proceeds to pay down the principal on its loan from MGG.  Instead, MGG only learned of the purported sales of the AP Breeding Rights in January 2020 when it uncovered Zayat Stables' fraud.

39.    In 2019, Zayat Stables and TGG also concealed from MGG, at a minimum, the following improper equine sales:

       a.    LEMOONA for $150,000, on or around March 6, 2019; and

       b.    A 55% ownership stake in AMANDREA for $115,500, on or around October 11, 2019; and

       c.    SOLOMINI for $250,000, on or around December 3, 2019.[3]

---

[3]  On or around January 2, 2018, MGG entered into a partial lien release agreement with Zayat Stables whereby MGG partially released its secured lien against SOLOMINI so as to allow Zayat Stables to sell 50% of its 100% ownership stake in SOLOMINI.  MGG retained a security interest in Zayat Stables; remaining 50% ownership stake.

40.     Each of the secret sales made in 2017, 2018, and 2019 were at prices far below the appraised value of the horses in question.

41.     Upon information and belief, Zayat Stables' pattern and practice of purporting to sell Zayat Stables' pledged equine collateral out from under MGG's security interests and without MGG's knowledge goes beyond the sales detailed above.

42.     MGG did not consent to any of the sales listed herein, and MGG was not informed of any of the sales beforehand.

43.     Finally, Zayat Stables did not make any principal payments as the result of any of these sales of Equine Collateral, as was required pursuant to Section 2.05(c)(ii) of the Financing Agreement.

**Zayat Stables Defaults on Its Loan Payments and MGG Brings Suit**

44.     TGG helped Zayat Stables and members of the Zayat family hide the existence of numerous events of default by Zayat Stables under the loan documents, which would have allowed MGG to declare events of default, accelerate the loan amounts and collect the loan amounts due against the collateral before the collateral had been dissipated.  Because of TGG's actions, MGG did not become aware of the events of default caused by the concealed sales until January 2020.

45.     On September 30, 2019, Zayat Stables failed to pay the principal and interest on the term loan, as was required pursuant to Section 2.03(a) of the Financing Agreement, giving rise to an Event of Default under Section 9.01(a) of the Financing Agreement.

46.     On or about December 4, 2019, MGG sent Zayat Stables a notice of default and reservation of rights.

47.     In January 2020, by virtue of Ahmed Zayat's confession to such, MGG became aware of the sales which had been concealed by Zayat Stables, the Zayat Family and TGG.

48.     Thereupon, as a result of the improper equine sales, the breaches of the Financing Agreement, and other actions by Zayat Stables and the Zayat family, MGG brought an action in Kentucky state court, *MGG v. Zayat Stables*, *et al.*, Civil Action No. 20-CI-00248 (the "Kentucky Action"), asserting several claims, including claims for fraud.

49.     In the Kentucky Action, MGG secured summary judgment against Zayat Stables based on Zayat Stables' breaches of its repayment obligations under the loan documents, awarding MGG $24,534,166.13 in damages, which is largely unavailable because of the sales of equine collateral by Zayat Stables and members of the Zayat family, and the actions of TGG. Additionally, Ahmed Zayat and Justin Zayat moved to dismiss MGG's fraud claims against them, which motion was denied.

50.     MGG's claims against other members of the Zayat family are currently pending in Florida and New Jersey, and Zayat Stables and Ahmed Zayat currently have pending bankruptcy petitions in New Jersey federal court.

51.     In litigating the Kentucky Action, MGG subpoenaed TGG and TGG produced documents in response to the subpoena.  Those documents form the basis of several of MGG's allegations in this action.  Before MGG received TGG's production, MGG had no way of uncovering TGG's wrongful conduct in connection with its financial reporting duties.

**TGG Actively Participates in Zayat Stables' Fraud**

52.     Zayat Stables did not accomplish this fraud on its own.  It needed the help of an accounting firm that was willing to produce false, misleading, and deceptive financial statements, which permitted Zayat Stables to defraud MGG and avoid its obligations under the Loan Documents.  Zayat Stables found that willing partner in TGG.

53.     At all relevant times, TGG was fully aware that the monthly, quarterly, and annual financial statements and reports and opinions it prepared for Zayat Stables were being provided to, and relied on by, MGG.

54.     As early as March 2, 2017, Jim Benkoil of TGG wrote to Dane Joella at MGG to introduce TGG as Zayat Stables' "accountants/auditors."

55.     Thereafter, in furtherance of the fraud, there was, at Zayat Stables' explicit direction, little subsequent communication directly between TGG and MGG.  Specifically, on March 4, 2017, Andrew Berkowitz, the COO of Zayat Stables, directed Mr. Benkoil that Zayat Stables "do[es] not want you to deal directly with MGG and Dane . . . or to answer any email with them without running the email response by us first."  A true and correct copy of this email exchange is attached hereto as Exhibit C.

56.     TGG was in possession of a copy of the Financing Agreement by no later than March 27, 2017, when David Bodner at Zayat Stables sent the Financing Agreement, and relevant amendments thereto, to Mr. Benkoil at TGG by email.  In addition, TGG was consistently copied on monthly interest statements sent to Zayat Stables by MGG.

57.     TGG knew that Section 7.01(a)(i) of the Financing Agreement required Zayat Stables to provide MGG with "internally prepared flash reporting of key operating metrics" of Zayat Stables every month.  In fact, TGG was directly involved in the preparation of these monthly reports.

58.     TGG also knew that Section 7.01(a)(ii) of the Financing Agreement required Zayat Stables to provide "quarterly financial statements, including a balance sheet, income statement and cash flow statement of the Borrower and its Subsidiaries as at the end of such quarter . . . fairly presenting, in all material respects, the financial position of the Borrower . . . in

accordance with GAAP. . . ."  Upon information and belief, TGG was directly involved in the preparation of these quarterly statements and reports.

59.     TGG also knew that Section 7.01(a)(iii) of the Financing Agreement required Zayat Stables to provide MGG with "consolidated and consolidating balance sheets, statements of operations and retained earnings, and statements of cash flows" on an annual basis.  Section 7.01(iii) also required a "report and an opinion, prepared in accordance with generally accepted auditing standards, of independent certified public accountants of recognized standing" that contained "a written statement of such accountants" that they "have not obtained any knowledge of the existence of an Event of Default" or "if such accountants shall have obtained any knowledge of the existence of an Event of Default . . . describing the nature thereof."  TGG was directly involved in the preparation of these annual reports and provided the required opinions thereon.

60.     Zayat Stables made clear to TGG that the materials TGG was preparing were being furnished to, and relied up by, MGG.  In an August 18, 2017 email, Mr. Berkowitz sent Mr. Benkoil at TGG a "link to a google document . . . that we will be maintaining internally for the MGG reporting process."  He then detailed the manner in which Zayat Stables reported cash balances to MGG and the manner in which he wanted revenue to be recognized in the monthly reports.  A true and correct copy of this email is attached hereto as Exhibit D.

61.     TGG knew that MGG was relying on the monthly "flash reporting" and the quarterly and annual financial statements, reports and opinions it prepared for Zayat Stables.

62.     TGG knew that MGG was relying on the materials and opinions it prepared for Zayat Stables, and it, together with Zayat Stables, perpetrated a fraud against MGG by, among other things:

a.      hiding revenue from the equine sales described above;

b.      manipulating financial statements to hide breaches of the Financing
Agreement;

c.      failing to uncover the extent of Zayat Stables' fraud, and failing to report
such fraud in the financial statements provided to MGG; and

d.      omitting from its annual financial reporting a required statement as to the
existence of Events of Default under the Financing Agreement.

**A.      TGG and Zayat Stables Hide Revenue from MGG**

63.      TGG, as Zayat Stables' accountant, was an active participant in and materially
aided Zayat Stables in concealing the equine sales described above from MGG.

64.      The work done by TGG in 2017 plainly demonstrates that TGG was an active
participant in Zayat Stables' fraud:  the financial statements for that year audited by TGG, sent to
MGG show a total of $7,755,550 in equine sales revenue, but TGG's own internal work papers
show equine sales revenue in the amount of $12,238,300.  In just that one year, TGG helped
Zayat Stables hide nearly *$4.5 million* in equine sales revenue from MGG.

65.      As reflected in TGG's 2017 internal work papers, this discrepancy was caused, in
part, by the failure to report numerous equine sales that were consummated in 2017, including (i)
the sale of JUSTIN SQUARED in May 2017 for $275,000; (ii) the sale of SIENA MAGIC in
June 2017 for $512,000; (iii) the receipt of $407,000 in insurance proceeds for EMMZY in
August 2017; (iv) the sale of EL KABEIR in September 2017 for $500,000; (v) the sale of
AMERICAN CLEOPATRA in November 2017 for $1.3 million; and (vi) the receipt of $500,000
in insurance proceeds for EGYPTIAN PRINCE in December 2017.

66.      TGG knew about these sales, as shown by the fact that the sales were recorded in
TGG's own work papers, and it knew that the sales and associated proceeds were not disclosed
to MGG in Zayat Stables' audited financial statements.

15

67.     Indeed, TGG regularly corresponded with Zayat Stables about their joint efforts to conceal equine sales revenue from MGG.  In a February 2018 email exchange between Zayat Stables' CFO Glenn Weiss and Jim Benkoil at TGG regarding the financial reports for December 2017, Mr. Benkoil sent revised financial statements that "delet[ed] Cairo Healer sale and add[ed] $50K to cash & AP."  When Mr. Weiss questioned why payroll was "still so high once the Cairo Healer sale was removed," Mr. Benkoil responded that he "left the bonuses on the P&L" but could "eliminate them today."  A true and correct copy of this email exchange is attached hereto as Exhibit E.

68.     On the same day, Mr. Benkoil and Mr. Weiss also corresponded about moving the sales of CAIRO HEALER or SO LONG SONOMA in order to hide from MGG improper distributions made to members of the Zayat family in December 2017.

69.     TGG further reduced reported revenue by improperly using the proceeds from sales to pay operating expenses, instead of paying them to MGG, as required.  For instance, Diane Massa of TGG sent an invoice received from McKathan Brothers to Mr. Benkoil on April 9, 2019, and he responded that the invoice "will be paid from proceeds" and that the invoice should not be posted to accounts payable.  A true and correct copy of this email exchange is attached hereto as Exhibit F.

70.     In addition, TGG concealed the revenue from Zayat Stables' improper sale of EL KABEIR by classifying the proceeds as capital contributions, not as revenue.

**B.     TGG and Zayat Stables Manipulate Zayat Stables' Financial Statements to Conceal Breaches of the Financing Agreement**

71.     In addition to hiding substantial amounts of revenue from MGG, TGG and Zayat Stables also concealed numerous breaches of the Financing Agreement by further manipulating Zayat Stables' financial statements.

72.     Section 7.03(a) of the Financing Agreement requires that "the ratio . . . of (x) the sum of the aggregate principal amount of all Loans outstanding at any such time *plus trade payables* and other accounts outstanding for more than 120 days . . . to (y) Total Equine Collateral Value" (the "Loan to Equine Collateral Value Ratio") not exceed "50% at any time on or after January 26, 2017" (emphasis added).

73.     Any failure of Zayat Stables to remain in compliance with the Loan to Equine Collateral Value Ratio would constitute an Event of Default under the Financing Agreement. (*See* Financing Agreement § 9.01(c)(i).)  As noted above, upon an Event of Default, MGG may "declare all or any portion of the Loans then outstanding to be accelerated and due and payable." (*Id.* § 9.01.)

74.     Zayat Stables fell out of compliance with Loan to Equine Collateral Value Ratio by the fall of 2017 because it did not possess sufficient Total Equine Collateral Value.

75.     To hide Zayat Stables' failure to comply with the Loan to Equine Collateral Value Ratio, TGG manipulated accounts payable reported on the financial statements, which had the effect of artificially depressing the numerator of the ratio, thus hiding the non-compliance.

76.     Under GAAP, accounts payable must be recorded using the date of the invoice and, if an invoice has not yet been received but the expense has been incurred, an accrued expense should be estimated and reported to maintain proper timing in the financial statements. However, on August 30, 2017, Mr. Benkoil wrote to Justin Zayat and Mr. Berkowitz that:  "As a

17

result of posting all the invoices for Equestris in July the 'Current' & '1-30 day' columns total 383,177. *This represent[s] the March – June Invoices*." (emphasis added)  Thus, instead of posting the invoices in March – June, when they were received, TGG improperly posted them in July.  A true and correct copy of this email is attached hereto as Exhibit G.

77.     This delay hid the lack of compliance with the Loan to Equine Collateral Value Ratio and allowed Zayat Stables to substantially delay required payments under the loan agreements.

78.     TGG's failure to follow GAAP standards facilitated Zayat Stables' fraudulent misrepresentations to MGG.

**C.     TGG Fails to Report Fraud and Events of Default under the Financing Agreement**

79.     Further, as Zayat Stables' accountants and auditors, TGG was obligated throughout its engagement with Zayat Stables to "obtain reasonable assurance about whether the financial statements are free from material misstatement, whether from (1) errors, (2) fraudulent financial reporting, (3) misappropriation of assets, or (4) violations of laws or governmental regulations that are attributable to [Zayat Stables] or to acts by management or employees acting on behalf of [Zayat Stables]."  (Exhibit A.)

80.     Yet TGG, because it was an active participant in the fraud, did nothing to report such fraud to MGG and in fact covered it up.

81.     Additionally, pursuant to Financing Agreement Section 7.01(a)(iii), TGG was required to include in its annual financial statements a statement about whether TGG was aware of any information concerning potential Events of Default under the Financing Agreement.

82.     As further evidence that TGG was aware of—and played an integral role in connection with—the fraud and the numerous Events of Default resulting from Zayat Stables and

TGG's conduct, none of the annual financial statements included any statement as to the existence of Events of Default, despite Section 7.01(a)(iii)'s explicit requirement that such a statement be included.

**TGG Failed to Prepare Required Financial Statements in Accordance With Generally Accepted Accounting Principles**

83.     TGG owed MGG a duty to exercise professional care, and to adhere to accepted standards of practice for accountants and auditors, in its monthly flash reporting and its preparation of Zayat Stables' financial statements and the accompanying audit reports and opinions.

84.     TGG owed this duty to MGG because, as set forth above, it was aware, at the time of its engagement and at all relevant times thereafter, that both the flash reporting and the audited financial statements and reports it prepared for Zayat Stables would be provided to MGG and that MGG was relying on those materials.

85.     As set forth in greater detail above, TGG demonstrated, through its conduct, that it understood MGG was relying on the materials it prepared.

86.     The professional standards of care for auditors that were applicable to TGG in its engagement by Zayat Stables were promulgated by the American Institute of Certified Public Accountants ("AICPA").  Those standards are set forth in the AICPA Code of Professional Ethics (the "Code") and in Generally Accepted Auditing Standards ("GAAS") that were codified as Statements on Auditing Standards ("AU-C").

87.     Mr. Benkoil and Mr. Green are members of the AICPA and New Jersey Society of CPAS, and their conduct was governed by the AICPA's standards.

88.     The accepted standards of practice include, *inter alia*, the principles of Objectivity and Independence, Due Care, and Integrity.  TGG violated each of these standards.

### A.      TGG Violated the Principle of Objectivity and Independence

89.      The Code requires that:  "A member should maintain objectivity and be free of conflicts of interest in discharging professional responsibilities.  A member in public practice should be independent in fact and appearance when providing auditing and other attestation services."  (Code § 0.300.050.01.)

90.      The principle of objectivity and independence "imposes the obligation to be impartial, intellectually honest, and free of conflicts of interest.  Independence precludes relationships that may appear to impair a member's objectivity in rendering attestation services." (Code § 0.300.050.02.)

91.      Similarly, AU-C states, in relevant part:

> In the case of an audit engagement, it is in the public interest and, therefore, required by this section, that the auditor be independent of the entity subject to the audit.  The concept of independence refers to both independence in fact and independence in appearance.  The auditor's independence from the entity safeguards the auditor's ability to form an audit opinion without being affected by influences that might compromise that opinion.  Independence enhances the auditor's ability to act with integrity, to be objective, and to maintain an attitude of professional skepticism.  Independence implies an impartiality that recognizes an obligation to be fair not only to management and those charged with governance of an entity but also users of the financial statements who may rely upon the independent auditor's report.

(AU-C § 200.A17.)

92.      TGG's engagement was infected with conflicts, demonstrating a total lack of objectivity.

93.      For example, on November 5, 2019, Len Green wrote to his son that Ahmed Zayat "reached out to me for a loan."  While Mr. Green declined that request, writing to Ahmed that he was "not in a position to fund any loans," he tried to turn Zayat Stables' financial needs to his personal advantage by asking whether he could purchase a season of breeding rights for

Triple Crown winner AMERICAN PHAROAH.  Specifically, he told Ahmed that he "would be interested in reviewing any 2020 seasons you are interested in selling on a No Guarantee basis." The subsequent discussion between Len Green and his son made clear that they hoped to acquire the breeding season at a discount.  True and correct copies of these email exchanges are attached hereto as Exhibits H and I.

94.     Mr. Green also told Justin Zayat, in an email with the subject line: "American Pharoah 2020 Seasons" that "[i]f Dad ha[s] any 'discounted no guaranteed seasons' he wanted to turn into cash, we would be interested."  These communications are a textbook example of a conflict of interest—Zayat Stables' auditor was attempting to exploit a weakness in its client's financials to its own financial benefit.  A true and correct copy of this email is attached hereto as Exhibit J.

95.     In addition, on at least one occasion, Mr. Benkoil of TGG presented an investment opportunity to Mr. Berkowitz of Zayat Stables.  In response to Mr. Benkoil's assertion that he could not "provide any info" about the opportunity because of a confidentiality agreement, Mr. Berkowitz informed Mr. Benkoil that, in connection with the potential investment, he was "willing to sign an NDA and also willing to review the material even while he is dealing with the other buyer."  A true and correct copy of this email exchange is attached hereto as Exhibit K.  It is unclear from the face of this correspondence whether Mr. Benkoil was presenting this opportunity to Zayat Stables or to Mr. Berkowitz personally.  In either case, it was a conflict of interest and a violation of the Code.

96.     TGG also consistently failed to meet the standard of independence.

97.     Rather than independently preparing Zayat Stables' financial statements, TGG regularly modified those statements in response to directions from Zayat Stables.  For example,

in an April 3, 2017 email, Mr. Berkowitz directed Mr. Benkoil to "take out all of the personal

loan amounts in the [balance sheet]."  Mr. Benkoil immediately complied, even though GAAP

required those loans to be reflected on the balance sheet.  A true and correct copy of this email is

attached hereto as Exhibit L.

98.     As set forth in further detail below, Mr. Berkowitz also explicitly directed Mr.

Benkoil to keep sales off the books until Zayat Stables received funds, even though those sales

should have been recorded earlier, when performance obligations were satisfied in accordance

with the signed and executed contracts.

99.     In addition, beginning in March 2017, Zayat Stables requested, and TGG

provided, a current TGG employee to act as a bookkeeper for Zayat Stables twice a week.  Thus,

Zayat Stables' purportedly independent auditor was also acting as an in-house bookkeeper for

Zayat Stables, thereby auditing itself, breaching both its duties of independence and objectivity.

100.     In fact, TGG attempted to hide the fact that it was auditing its own work.  In 2017,

the TGG employee acting as a bookkeeper for Zayat Stables, Diane Massa, used *three* different

email addresses: first, she used her TGG email address; then, starting in the middle of 2017, she

used her personal email address; and finally, from late 2017 on, she used a Zayat Stables email

address.

**B.     TGG Violated the Due Care Principle**

101.     The Code states that members "should observe the profession's technical and

ethical standards, strive continually to improve competence and the quality of services, and

discharge professional responsibility to the best of the member's ability."  (Code

§ 0.300.060.01.)

102.     The due care principle "requires a member to discharge professional

responsibilities with competence and diligence.  It imposes the obligation to perform

professional services to the best of a member's ability, with concern for the best interest of those for whom the services are performed, and consistent with the profession's responsibility to the public."  (Code § 0.300.060.02.)

103.    The AU-C similarly provides that due care "requires the auditor to discharge professional responsibilities with competence and to have the appropriate capabilities to perform the audit and enable an appropriate auditor's report to be issued."  (AU-C § 200.A19.)

104.    As set forth in greater detail above, TGG failed to act in accordance with the principle of due care by, *inter alia*:

      a.    hiding revenue from the equine sales described above;

      b.    manipulating financial statements to hide breaches of the Financing Agreement; and

      c.    omitting from its annual financial reporting a required statement as to the existence of Events of Default under the Financing Agreement

105.    In addition, TGG violated the principle of due care by improperly delaying recognition of revenue from certain equine sales.

106.    Under GAAP, Zayat Stables was required to recognize revenue on an accrual, as opposed to a cash, basis.  In other words, revenue from equine sales should have been recognized when performance obligations were satisfied in accordance with the signed and executed contracts, regardless of when Zayat Stables actually received cash.

107.    In August 2017, however, Mr. Berkowitz of Zayat Stables explicitly directed Mr. Benkoil of TGG to keep sales off the books until Zayat Stables received funds.  He wrote:  "We need to [be] mindful of specific sales and make sure we *only put them in the books when we receive funds*.  To date we have only reported horse sales in the month in which we receive funds.  We will continue to do so, just want to make sure we stay on top of this."  (*See* Exhibit D (emphasis added).)

108.     TGG complied with this direction, even though it knew that GAAP standards required revenue to be recognized on an accrual basis.

109.     For example, email correspondence between Mr. Benkoil and Mr. Berkowitz indicates that five sales occurred in January 2017—JOJO MELODY, LEGENDARY STACY, ASHEROONEY, THIRTYSIXTH, and UNDER COVER ANGEL.  These transactions were not recorded until February 13, 2017.

110.     Similarly, sale documentation shows that AMERICAN CLEOPATRA was sold on November 13, 2017, but the sale was not recorded until December 6, 2017.  Further, this sale was not reflected in the reports and financial statements that were provided to MGG.

### C.     TGG Violated the Integrity Principle

111.     The Code provides:  "To maintain and broaden public confidence, members should perform all professional responsibilities with the highest sense of integrity." (Code § 0.300.040.01.)

112.     The integrity principle "requires a member to be, among other things, honest and candid within the constraints of client confidentiality.  Service and the public trust should not be subordinated to personal gain and advantage.  Integrity can accommodate the inadvertent error and honest difference of opinion; it cannot accommodate deceit or subordination of principle." (Code § 0.300.040.01.)

113.     TGG violated the integrity principle by placing its personal gain and advantage before the public trust.  Among other things, TGG attempted to use Zayat Stables' financial difficulties to purchase discounted breeding seasons for the Triple Crown winner American Pharoah.

114.     TGG also demonstrated a lack of integrity by assisting Zayat Stables in fabricating expenses to hide personal credit card charges.  Specifically, in March 2016, Ms.

24

Massa flagged for Mr. Benkoil a discrepancy between the total balance reflected in Zayat

Stables' credit card statement and the balance owed by the business, as reflected in Quickbooks.

Mr. Benkoil directed Ms. Massa to account for the difference by preparing a bill in the amount of

the discrepancy and allocating it to the following categories:  Board, Training, Travel, Office

Supplies, Meals & Entertainment, Racing Expenses General, and Medication Treatment.  A true

and correct copy of this email is attached hereto as Exhibit M.

115.     TGG also violated the integrity principle by manipulating Zayat Stables' financial

statements to hide revenue, delay the recognition of revenue and hide breaches of the Financing

Agreement.

116.     Integrity "also requires a member to observe the principles of objectivity and

independence and of due care."  (Code § 0.300.040.05.)

117.     As set forth above, TGG violated the principles of objectivity and independence

and due care.  Therefore, it also violated the integrity principle.

## COUNT I
### (Accountant Malpractice)

118.     MGG repeats and re-alleges the allegations made in paragraphs 1 through 117 of

this Complaint as if fully set forth herein.

119.     Jim Benkoil and Leonard Green were at all relevant times hereto certified public

accountants, and their services were therefore subject to the AICPA Code of Professional Ethics,

GAAS codified as Statements on Auditing Standards and GAAP.

120.     At all times relevant hereto, TGG was Zayat Stables' outside accounting firm for

purposes of providing professional advice and counsel on matters of finance, financial reporting,

and other related matters.

121.     TGG owed a duty of care to MGG because TGG:

     a.     knew that the work product they provided to Zayat Stables was being made available to MGG, which TGG knew to be Zayat Stables' lender;

     b.     knew that MGG was relying upon the accounting services, statements, reports and opinions provided by TGG in connection with its loan to Zayat Stables; and

     c.     expressed to MGG, through its conduct, that it understood that MGG was relying upon the accounting services, statements reports and opinions it provided to Zayat Stables.

122.    TGG materially deviated from the recognized and accepted professional standards for accountants and auditors by engaging in the actions alleged herein, including, *inter alia*:

     a.     failing to adhere to the principle of independence and objectivity, by attempting to profit from Zayat Stables' financial difficulty, acceding to Zayat Stables' directions to manipulate financial statements, and discussing personal loans and investment opportunities with Zayat Stables;

     b.     failing to adhere to the principle of due care, by hiding and failing to report equine sales, incorrectly recording revenue from equine sales on a cash basis instead of an accrual basis, and incorrectly recording accounts payable invoices; and

     c.     failing to adhere to the integrity principle, by manipulating Zayat Stables' financial statements to hide breaches of the Financing Agreement.

123.    MGG reasonably relied upon the services, statements, reports and opinions provided by TGG, as well as the representations made in connection with the accounting services provided by TGG.

124.    As a direct and proximate cause of TGG's acts and omissions, MGG suffered injury and economic loss in an amount to be proven at trial.

## COUNT II
### (Fraud)

125.    MGG repeats and re-alleges the allegations made in paragraphs 1 through 124 of this Complaint as if fully set forth herein.

126. As set forth above, TGG perpetrated a fraud on MGG by hiding equine sales and covering up Zayat Stables' breaches of the Financing Agreement.

127. TGG perpetrated the fraud by:

    a.      hiding revenue from the equine sales described above;

    b.      manipulating financial statements to hide breaches of the Financing Agreement;

    c.      failing to uncover the extent of Zayat Stables' fraud, and failing to report such fraud to MGG; and

    d.      omitting from its annual financial reporting a required statement as to the existence of Events of Default under the Financing Agreement.

128. In furtherance of that fraud, TGG made material false representations to MGG in the monthly flash reports, the quarterly financial statements, and the annual financial statements and opinions. Those material misrepresentations included, *inter alia*:

    a.      substantially understating Zayat Stables' revenue by omitting the equine sales described in this complaint;

    b.      misstating Zayat Stables' accounts payable to hide breaches of the Loan to Equine Collateral Value Ratio; and

    c.      omitting information concerning Events of Default from the annual financial statements, thereby implicitly representing to MGG that no such Events of Default had occurred.

129. TGG knew and intended that MGG would rely upon its misrepresentations, as shown by, *inter alia*, the following facts:

    a.      TGG was in possession of the Financing Agreement by no later than March 27, 2017, and that Financing Agreement required Zayat Stables to provide MGG with monthly flash reporting and quarterly and annual financial statements, all of which were prepared by or with the assistance of TGG.  (*See* Financing Agreement § 7.01(a)(i) – (a)(iii).)

    b.      TGG knew that the reports, statements, and opinions it was preparing were being furnished to MGG (*see* Exhibit D), and it knew that those materials were the only means by which MGG could monitor Zayat Stables' compliance with the Financing Agreement.

     c.      In 2017, the financial statements prepared and audited by TGG and provided to MGG showed a total of $7,755,550 in equine sales revenue, but TGG's own internal work papers showed equine sales revenue in the amount of $12,238,300. Such a blatant misstatement by TGG would have been wholly unnecessary if the financial statements were not being relied upon by Zayat Stables' lender, MGG.

     d.      Further, as set forth above, in late 2017, TGG materially misstated Zayat Stables' accounts payable. That misstatement by TGG had the purpose and effect of hiding breaches of the Loan to Equine Collateral Value Ratio from MGG and would have been wholly unnecessary if the financial statements were not being relied upon by Zayat Stables' lender, MGG

130.    MGG reasonably relied upon TGG's misrepresentations, to its detriment; in particular, MGG reasonably relied upon the revenue, accounts payable, and other information provided by TGG.

131.    TGG's wrongful acts have caused significant damage to MGG. As a result of TGG's wrongful acts, MGG was unaware of the existence of Events of Default and did not accelerate the loan when it could have done so under the Financing Agreement. (*See* Financing Agreement § 9.01.)

132.    While MGG was unaware of the existence of Events of Default, Zayat Stables sold much of the equine collateral securing the loan.

133.    By the time Zayat Stables failed to satisfy its payment obligations on September 30, 2019, MGG could not realize on the collateral that secured the loans because much of it had already been sold. Those sales were hidden from MGG by Zayat Stables and members of the Zayat family, all with the active participation of TGG.

134.    To date, more than $24 million in principal, plus accrued interest, remains unpaid, with little collateral against which MGG can recover.

135.    Thus, as a direct and proximate cause of TGG's fraud, MGG has suffered substantial damages, in an amount to be proven at trial.

## COUNT III
### (Aiding and Abetting Fraud – Alternative to Count II)

136.    MGG repeats and re-alleges the allegations made in paragraphs 1 through 135 of this Complaint as if fully set forth herein.

137.    In the event that TGG is not liable for defrauding MGG, it nevertheless aided and abetted Zayat Stables' fraud.

138.    TGG was aware that Zayat Stables was engaged in a fraud against MGG and knew that Zayat Stables was depending on and relying on TGG's assistance in perpetrating that fraud.

139.    TGG provided substantial assistance to Zayat Stables in defrauding MGG by:

    a.    hiding revenue from the equine sales described above;

    b.    manipulating financial statements to hide breaches of the Financing Agreement;

    c.    failing to uncover the extent of Zayat Stables' fraud, and failing to report such fraud to MGG; and

    d.    omitting from its annual financial reporting a required statement as to the existence of Events of Default under the Financing Agreement.

140.    As a direct and proximate cause of TGG's aiding and abetting Zayat Stables' fraud, MGG has suffered substantial damages, in an amount to be proven at trial.

WHEREFORE, MGG respectfully requests that the Court enter an Order in its

favor against TGG granting the following relief:

     a.      On Count I, an award of damages against TGG in an amount to be proven at trial;

     b.      On Count II, an award of damages against TGG in an amount to be proven at trial;

     c.      On Count III, an award of damages against TGG in an amount to be proven at trial;

     d.      An award of costs and reasonable attorneys' fees;

     e.      An award of pre- and post-judgment interest; and

     f.      Such other and further relief as the Court may deem just and proper.

Dated:  New York, New York
         October 23, 2020

**SCHULTE ROTH & ZABEL LLP**

  /s/  Robert J. Ward
_____
Robert J. Ward
Frank W. Olander
Thomas L. Mott
919 Third Avenue
New York, New York 10022
Tel: (212) 756-2000
robert.ward@srz.com
frank.olander@srz.com
thomas.mott@srz.com

_Attorneys for MGG Investment Group LP_